IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>BRIAN GUARDADO,<br><br>    Defendant. | ORDER<br>and<br>MEMORANDUM DECISION<br><br><br><br>Case No. 2:10-CR-1042-TC |

Brian Guardado was indicted and charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Mr. Guardado has moved to suppress physical evidence obtained during the search of his person. Mr. Guardado contends that the evidence should be suppressed because it was obtained in violation of his Fourth Amendment rights to be free from unreasonable searches and seizures. For the reasons set forth below, Mr. Guardado's motion is DENIED.

**FINDINGS OF FACT**

About 1:00 a.m. on September 5, 2010, Detective Jacob Burton was on patrol in the area of 2100 South to 3300 South and 500 East to State Street in South Salt Lake, Utah. Detective Burton described this area as the location of a "tagging feud or graffiti feud going on between a tagging crew and [the] East Side Rascals QVO" (QVO), a street gang whose members typically

1

wear brown clothing. (Tr. of Evidentiary Hr'g (Tr.) at 15.) Detective Burton had been employed with the South Salt Lake Police Department for more than eight years, was highly trained in gang investigations, and was assigned to the Salt Lake Metro Gang Task Force.

While driving north on 500 East at about 2700 South, Detective Burton noticed four men walking south on the west side of the sidewalk. Detective Burton turned around and drove south on 500 East so that he could shine his headlights on the group to get a better look at who they were and what they were doing. The area was well lit by the traffic lights and with his headlights on the group, Detective Burton was able to see that one of the men was carrying a backpack and that most of them were dressed in brown clothing, including Mr. Guardado, who was wearing brown jacket.

Detective Burton's attention was initially drawn to the four men because foot traffic in that area is very limited at night; graffiti was a common problem in the area; the four men were wearing brown clothing, associated with QVO; and one of the men was carrying a backpack. Detective Burton testified that, in his experience, gang members who were "tagging"[1] often carried the "graf kit." (Tr. at 15.) But Detective Burton did not see that any of the four men had spray paint or other substances used for tagging, and he did not immediately recognize any of them as gang members. Detective Burton drove past the group several times and then decided that he was going to try to speak with them. While Detective Burton was turning around so that

---

[1]"Tagging" is a form of graffiti, usually done with spray paint, that involves a personalized logo or signature. See Graffiti: Characteristics of Common Graffiti, http://en.wikipedia.org/wiki/Graffiti#Characteristics_of_common_graffiti (last visited Mar. 22, 2011).

he could pull up behind the group, Detective Clark, another detective in the area, communicated with Detective Burton over the air and asked if he had seen the group of men. Detective Burton responded that he had and that he was planning to try to speak with them.

Detective Burton, now heading south on 500 East, stopped about twenty to thirty feet behind the group, parked his car, and turned his deck lights on as a safety measure. As Detective Burton opened his door he heard someone yell, "Cops." (Tr. at 11.) Detective Burton then saw Mr. Guardado move from the back of the group, briskly walk past the others on the right-hand side of the sidewalk, and start to run. As soon as Mr. Guardado began running, Detective Burton said, "Police. Stop. Police. Stop." (Tr. at 11.) Mr. Guardado continued to run. Detective Burton instructed the other three men to sit on the sidewalk and began to chase Mr. Guardado, yelling at him to stop. Detective Burton testified that he decided to chase Mr. Guardado "[b]ased on the totality of everything that [he] was able to interpret that night, the location, the area, the gang activity, the colors, the clothing, and his actions," including Mr. Guardado's running. (Tr. at 16.)

As Detective Burton chased Mr. Guardado, he saw Mr. Guardado's hand continue to go in front of his body. Detective Burton believed that Mr. Guardado was "physically holding something like he was holding his pants up or holding a weapon or trying to grab something the entire time from his front waistband." (Prelim. Hr'g Tr. at 26.) During the time that Detective Burton was chasing Mr. Guardado, Detective Clark had parked his car in front of Mr. Guardado's path. Detective Clark got out of his car and yelled, "Police. Stop." (Tr. at 12.) Mr. Guardado continued to run, and Detective Clark tackled him.

Once Detective Clark had tackled Mr. Guardado, neither he nor Detective Burton was able to get Mr. Guardado's left hand out from underneath his body; Mr. Guardado did not

3

comply with their repeated orders. Detective Clark was ultimately able to free Mr. Guardado's left hand and place him in handcuffs. At this point, Detective Burton flipped Mr. Guardado over and frisked Mr. Guardado's waistband area because he was "concerned that [Mr. Guardado] may have a weapon based on the movements that [he] saw when [Mr. Guardado] was running." (Tr. at 19.) Detective Burton immediately felt a large firearm in the groin area of Mr. Guardado's pants.

**CONCLUSIONS OF LAW**

Mr. Guardado contends that the physical evidence should be suppressed because Detective Burton did not have reasonable suspicion to justify the seizure and because he did not have reasonable suspicion to justify the protective frisk.

**A.     Detective Burton had reasonable suspicion to justify the seizure.**

Mr. Guardado was seized when Detective Clark tackled him.[2] See Florida v. Bostick, 501 U.S. 429, 437 (1991) (A seizure of the person within the meaning of the Fourth Amendment occurs when "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988))).

---

[2]Mr. Guardado argues that he was seized when Detective Burton yelled, "Police. Stop. Police. Stop." and that California v. Hodardi D., 499 U.S. 621 (1991) (holding that the defendant was not seized until he was tackled, even though the police officer had yelled for him to stop) was wrongly decided. Even if Mr. Guardado was seized when Detective Burton yelled for him to stop, the reasonable suspicion analysis would be the same; Mr. Guardado had begun running and Detective Burton's suspicion was not based on any event that occurred after he yelled for Mr. Guardado to stop.

4

The question now is whether Detective Burton had a reasonable, articulable suspicion that Mr. Guardado was engaged in criminal activity. See Terry v. Ohio, 392 U.S. 1, 21 (1968). Given the totality of the circumstances, the court finds that Detective Burton did.

"While the Court has recognized in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). When making a reasonable suspicion determination, the court "must look at the 'totality of the circumstances' . . . to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 418). And reviewing courts "accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995) (citing United States v. Lopez-Martinez, 24 F.3d 1481, 1484 (10th Cir. 1994)).

At the time that Detective Burton seized Mr. Guardado he had observed the following: (1) Mr. Guardado and three other men walking on the sidewalk at 1:00 a.m.; (2) that they were in an area with a high prevalence of graffiti, especially by the QVO gang; (3) that each of the four men was wearing brown clothing, a color favored by members of QVO; (4) that one of the men was carrying a backpack, a device typically used by tagging gangs to carry their "graff kit"; and

(5) that after someone yelled, "Cops" Mr. Guardado briskly moved to the front of the group and then began to run. The circumstances preceding the seizure of Mr. Guardado, taking into account Detective Burton's experience, gave Detective Burton a reasonable and articulable suspicion that Mr. Guardado was engaged in criminal activity.

The fact that these events occurred late at night, at 1:00 a.m., supports a reasonable suspicion that Mr. Guardado was engaged in criminal activity. See United States v. Clarkson, 551 F.3d 1196, 1202 (10th Cir. 2009) (considering time of night, 1:10 a.m., in reasonable suspicion analysis); Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1029 (10th Cir. 1997) (considering time of night, 1:15 a.m., in reasonable suspicion analysis). And Mr. Guardado's presence in a high crime area is a "relevant contextual consideration[]." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

Although gang affiliation alone cannot create a reasonable suspicion to support a search or seizure, it may be an appropriate factor in determining if reasonable suspicion exists. See United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009) (indicating the fact that officer had previously seen pepole standing outside home wearing colors associated with local gang was an appropriate factor, considered in the totality of the circumstances, to support reasonable suspicion); United States v. Garcia, 459 F.3d 1059, 1067 (10th Cir. 2006) (holding that "[a]lthough not necessarily determinative by itself, . . . gang connection further supports the reasonableness of a weapons frisk"). And Mr. Guardado's unprovoked flight upon noticing Detective Burton is a "pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124 ("Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

When considered together, under the totality of the circumstances, these facts justify a reasonable suspicion that Mr. Guardado was engaged in criminal activity. See id. (holding officers had reasonable suspicion to stop defendant after seeing him standing, holding an opaque bag in an area known for narcotics trafficking, and the defendant fled upon seeing the officers).

Mr. Guardado analogizes his situation to that presented in United States v. Davis, 94 F.3d 1465 (10th Cir. 1996), where the court held the circumstances did not give rise to reasonable suspicion of criminal activity. But the facts here, as described above, are far more indicative of criminal behavior than those in Davis.

For the foregoing reasons, the court finds that Detective Burton had reasonable suspicion to stop Mr. Guardado.

## B. Detective Burton reasonably believed that Mr. Guardado was armed and dangerous.

Having determined Detective Burton had reasonable suspicion to stop Mr. Guardado, the question now is whether Detective Burton reasonably believed that Mr. Guardado was armed and dangerous. See Terry, 392 U.S. at 27, 30. Under the totality of the circumstances, the court concludes that Detective Burton had the reasonable and articulable suspicion necessary to conduct a protective frisk of Mr. Guardado.

"If [an] officer has such reasonable and articulable suspicion [justifying a stop], she may also conduct a protective frisk of the suspect's outer clothing if she reasonably believes that the suspect might be armed and dangerous." United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002). The officer must be able to "point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64 (1968).

At the time Detective Burton frisked Mr. Guardado, he had observed Mr. Guardado reaching toward his front waistband the entire time he had been running, as if he was holding something. Once Detective Clark had tackled Mr. Guardado, Mr. Guardado would not release his left hand from underneath his body, despite orders from both Detective Clark and Detective Burton to do so. When Mr. Guardado finally released his arm, Detective Burton conducted a frisk because he was "concerned that [Mr. Guardado] may have a weapon based on the movements that [he] saw when [Mr. Guardado] was running." (Tr. at 19.)

A suspect's refusal to remove his hands from his pockets, even after being ordered to do so by the police, justifies a reasonable belief that the suspect might be armed and dangerous. Harris, 313 F.3d at 1236 (holding that officer had reasonable belief that defendant was armed and dangerous when he saw the suspect acting nervously with his hands in his pockets and the defendant refused to remove his hands even after the officer asked him to do so). Moreover, Detective Burton reasonably believed that Mr. Guardado belonged to QVO. See Garcia, 459 U.S. at 1067 ("gang connection further supports the reasonableness of a weapons frisk").

Accordingly, the court finds that Detective Burton's protective frisk was justified.

## ORDER

Mr. Guardado's motion to suppress (Dkt. No. 13) is DENIED.

DATED this 22nd day of March, 2011.

BY THE COURT:

*Tena Campbell*
_____
TENA CAMPBELL
United States District Judge